**FILED**

MAR 3 1 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF OHIO

## WESTERN DIVISION

3 :22 CV 528

---

### COMPLAINT WITH JURY DEMAND  "PUTATIVE CLASS ACTION"

---

Anthony S. Leach, *pro se*

#392426

Marion Correctional Institution

P.O. Box 57

Marion, Ohio 43301-0057

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

# WESTERN DIVISION

ANTHONY S. LEACH,

     Plaintiff,

Versus

STATE OF OHIO, OHIO DEPARTMENT OF
REHABILITATION AND CORRECTION,
MARION CORRECTIONAL INSTITUTION,
MITZY CLARK, STEVEN HARFORD,
KASEY PLANK, KELLY RIEHLE, CHRIS
LAMBERT, TARA REES, LATONYA
COTTON, DANIEL STRAKER, DON
MELTON, NICOLLE WAMPLER, JAMES
WATSON, LYNEAL WAINWRIGHT,
ANNETTE CHAMBERS-SMITH, JOHN
DOES, JANE DOES, THERESA SMITH, LISA
CONNELLY, AKIL RAGLAND, MARTINO F.
CELLI, CALEB STEINMETZ, KIMBERLY
BAKER-McGARY, RICHARD A. WILLIAMS,
KAREN STANFORTH, RYAN JAMES,
ARAMARK CORPORATION.

Case No.: **3:22 CV 528**

Honorable: **JUDGE HELMICK**

**MAG JUDGE CLAY**

DEFENDANTS.

# COMPLAINT WITH JURY DEMAND

## Introduction

This is a civil rights action filed by Anthony S. Leach, a state prisoner, for damages and declaratory and injunctive relief under 42 U.S.C. § 1983, the Americans with Disability Act (ADA), and the Prison Rape Elimination Act (PREA) alleging: excessive use of force, denial of medical care, denial of medical treatment, violation of 42 U.S.C.S. § 12131 et seq. of Title II of the Americans with Disabilities Act, violation 34 U.S.C.S. § 30305 for misappropriation and misuse of federal funds from the Prison Rape Elimination Act (PREA) to create unsafe and dangerous living conditions, inadequate ventilation and heating, unsafe and unsanitary food preparation and handling, all in violation of the Eighth Amendment of the United States Constitution; denial of access to all forms of communication with family and anyone outside of Marion Correctional Institution (hereinafter Marion), including, but not limited to telephones, GTL tablets, pens, pencils, paper and envelopes in violation of the First Amendment of the United States Constitution; denial of access to and just adjudications of the grievance system in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The plaintiff also alleges a mass toxic tort, several torts for assault and battery, and the tort of negligence. The plaintiff seeks injunctions: forcing the defendants to supply an adequate amount of soap; forcing the defendants to supply antibacterial soap; enjoining the defendants from continuing to use the existing swinging doors; forcing the Ohio Department of Rehabilitation and Correction (hereinafter, ODRC) to record premeditated uses of force; against punitively withholding life-sustaining medical equipment from inmates who

are Americans with Disabilities under the Act; enjoining defendants from continuing the practice of permitting inmates to touch the sporks, cups and levers of the drinking cambros with their bare, unwashed hands; forcing the defendants to implement a policy and practice of cleaning fecal matter, urine, blood and other substances from the walls, floors and other surfaces in the segregation, quarantine and suicide cells.

## Jurisdiction

1. The Court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 42 U.S.C. §§ 1331(1) and 1343.

2. The Court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C. § 1367.

## Parties

3. The plaintiff, Anthony S. Leach was incarcerated at Marion Correctional Institution (hereinafter, Marion) during the events described in the complaint.

4. Defendant Mitzy Clark was a correctional officer employed at Marion and she was generally in charge of the chemical room and specifically in charge of the allocation of cleaning chemicals and soap. She is sued in her individual capacity.

5. Defendant Steven Harford is the Health and Safety Officer at Marion and he is specifically responsible for assessing and correcting unsafe conditions at Marion, ensuring compliance with applicable federal and state laws, codes, rules, regulations, policies and practices related to the protection of staff and inmates. He is also specifically responsible for ensuring compliance with the strictures of the Americans with Disabilities Act. He is sued in his individual and official capacities.

6.  Defendant Kasey Plank was the Institutional Inspector at Marion and is specifically responsible for adjudicating claims made in inmate grievances and is specifically responsible, as a member of the "hunger strike committee," for evaluating the protests of inmates who are on a hunger strike. She is sued in her individual and official capacities.

7.  Defendant Kelly Riehle is an Assistant Chief Inspector at the ODRC's Operational Support Center (hereinafter, OSC) and is generally responsible for reviewing inmate appeals of the decisions made in grievances. She is sued in her individual and official capacities.

8.  Defendant Chris Lambert is the Chief Inspector at ODRC's OSC and he is generally responsible for reviewing inmate appeals of the decisions made in grievances and is specifically responsible for hearing grievances against all ODRC's Institutional Inspectors and Wardens. He is sued in his individual capacity.

9.  Defendant Tara Rees was the Health Care Administrator at Marion and she was generally responsible for ensuring provision of medical care to inmates and, as a member of the "hunger strike committee," was specifically responsible for evaluating the protests of inmates on hunger strikes from a medical standpoint. She is sued in her individual capacity.

10.  Defendant Daniel Straker was the Chief of Security at Marion and he was generally responsible for all aspects of institutional security and, as a member of the "hunger strike committee," was specifically responsible for evaluating the protests of inmates on hunger strikes from a security standpoint. He is sued in his individual capacity.

11.  Defendant Don Melton was the Deputy Warden of Operations at Marion and he was generally responsible for the daily operations of the prison and, as a member of the "hunger strike committee," was specifically responsible for evaluating the protests of inmates on hunger strikes. He is sued in his individual capacity.

12. Defendant Nicolle Wampler was the Deputy Warden of Special Services at Marion and she was generally responsible for the operations at Marion that are outside of the "day-to-day operations" and, as a member of the "hunger strike committee," was specifically responsible for evaluating the protests of inmates on hunger strikes. She is sued in her individual capacity.

13. Defendant James Watson was the Mental Health Coordinator at Marion and he was generally responsible for addressing the mental health needs of inmates and, as a member of the "hunger strike committee," was specifically responsible for evaluating the protests of inmates on hunger strikes. He is sued in his individual capacity.

14. Defendant Lyneal Wainwright was the Warden at Marion and she was generally responsible for the overall operation of the prison and, specifically received reports from the hunger strike committee. She is sued in her individual capacity.

15. Defendants John Does and defendants Jane Does are individuals employed by the State of Ohio, that have misappropriated federal funds and who have failed to provide the constitutionally adequate conditions of confinement, described infra. They are sued in their individual and/or official capacities.

16. Defendant Theresa Smith is a registered nurse at Marion and she is generally responsible for providing medical care, generating reports regarding inmate medical issues, and dispensing medications to inmates. She is sued in her individual capacity.

17. Defendant Lisa Connelly is a correctional officer at Marion. She is sued in her individual capacity.

18. Defendant Akil Ragland is a correctional lieutenant at Marion. He is sued in his individual and official capacities.

19. Defendant Latonya Cotton was the Deputy Warden of Operations at Marion. She is sued in her individual capacity.

20. Defendants Martino F. Celli and Caleb Steinmetz are correctional officers at Marion. They are sued in their individual capacity.

21. Defendant Kimberly Baker-McGary was a registered nurse at Marion. She is sued in her individual capacity.

22. Defendant Richard A. Williams was a correctional lieutenant at Marion. He is sued in his individual capacity.

23. Defendant Karen Stanforth is an Assistant Chief Inspector at the ODRC's Operational Support Center and is generally responsible for reviewing inmate appeals of the decisions made in grievances. She is sued in her individual capacity.

24. Defendant Annette Chambers-Smith is the Director of the Ohio Department of Rehabilitation and Correction. She is sued in her individual capacity.

25. Defendant Ryan James is the Assistant Director for ARAMARK at Marion Correctional Institution. He is specifically responsible for ascertaining that the food services provided to inmates are safe and sanitary. He is sued in his individual capacity.

26. Defendant ARAMARK is the corporation responsible for ascertaining that the food services provided to inmates is safe and sanitary. ARAMARK is sued in its individual capacity.

27. All the defendants have acted, and continue to act, under color of state law at all times relevant to this complaint.

Class Action Allegations

This action is brought and maintained under Federal Rule of Civil Procedure 23(b)(2).

The appropriate allegations thought by the *pro se* litigant to justify a mass toxic tort claim include, but are not limited to:

A.  *Size*: There were approximately two thousand four hundred (2,400) inmates and four hundred (400) staff at Marion Correctional Institution when this prison made and stayed in the world news for about one (1) month because of the Covid-19 "outbreak" that the plaintiff predicted (within a few months) would strike Marion Correctional Institution because of the unconstitutional conditions of confinement existing there.

There are over thirty prisons in the State of Ohio. In *toto*, there are approximately forty-three thousand (43,000) inmates in the State of Ohio and several thousand Ohio Department of Rehabilitation and Correction employees.

All of these prisons are governed by the policies, practices and rules established by the director of the Ohio Department of Rehabilitation and Correction.

The dangerous wooden swinging doors were installed in response to the State of Ohio accepting federal funds under 34 U.S.C.S. §30305 of the Prison Rape Elimination Act (PREA) in an inept attempt to provide a safer environment to the inmates and staff located in the prisons spread across the State of Ohio.

Out of the two thousand four hundred (2,400) inmates and four hundred (400) staff at Marion Correctional Institution, about one thousand two hundred inmates live in the dorms where the dangerous, porous wooden doors are located. However, these inmates and the many staff that work in those dorms move freely through the prison touching everything in the prison. Thus, the individuals affected by these unconstitutional conditions of

confinement also includes everyone at Marion Correctional Institution which is close to three thousand individuals.

Moreover, the policy and practice of the Ohio Department of Rehabilitation and Correction of refusing to provide an adequate amount of soap and no antibacterial soap has unquestionably led to inmates and staff contracting other serious communicable diseases, including, but not limited to: staph infections; mercer infections; tuberculosis; hepatitis C; and, other medical conditions which have irrevocably altered the quality of the lives of those individuals affected, and killed others.

Finally, including the inmates and staff that have been subjected to the unconstitutional conditions of confinement throughout the other prisons the State of Ohio the true number of plaintiffs more than satisfies the numerosity requirements of Federal Rule of Civil Procedure 23

B.  *The question of law and fact "common" to all plaintiffs*:  From the mind of an inmate with a ninth (9th) grade education, the question "common" to both plaintiff and defendant classes would simply be:

"Did the defendants, by: installing porous, wooden, swinging doors; not providing an adequate amount of soap or ventilation; not providing any antibacterial soap; and, by overcrowding the prisons, culture an environment that proximately caused and contributed to the "vir[al]" "outbreak" predicted by the plaintiff which killed many and made many others suffer horribly within a few months of his predictions."

C.  *Typicality*: The named parties claims and defenses are typical of the remainder of the proposed plaintiff and defendant classes and is satisified by the policies, practices and procedures of the defendant's refusal to provide the minimal constitutionally adequate

conditions of confinement, to wit: a safe alternative to the dangerous, porous, swinging doors; an adequate amount of soap; any antibacterial soap; adequate ventilation; and, an environment which was not extremely overcrowded.

D.  *The bases upon which the party or parties maintaining the class action or other parties claiming to represent the class are alleged to be an adequate representative of the class*:

I make no claim that I am in any way, shape, fashion or form an "adequate representative" of the class. Indeed, my assertion in this regard is the extreme opposite. I am wholly inadequate to represent my own claims, and even less adequate to represent anyone else's claims.

However, the plaintiff was the person who discovered the unconstitutional conditions of confinement. The plaintiff was the person, who fiercely advocated and suffered in an exhausting attempt to get the plaintiffs to correct the unconstitutional conditions of confinement. Indeed, the plaintiff may be the only person who knows of the existence of the unconstitutional conditions of confinement which give rise to this action. Without the efforts of the plaintiff, there would be no cause of action against the defendants for the mass toxic tort that the plaintiff has revealed.

The plaintiff simply cannot carry this burden further. The plaintiff begs this Court to appoint interim counsel to adequately represent the plaintiff and the other co-plaintiffs in this action.

Facts

28. On June 11, 2019, the plaintiff was moved from M-block (a cell block) to E-dorm (an open dormitory).

29. While the plaintiff was living in E-dorm, he was classed as a porter (an inmate who cleans).

30. As a porter, the plaintiff's general duties included cleaning areas of E-dorm that required cleaning.

31. While living in E-dorm, the plaintiff observed that wooden (porous) swinging doors had been installed at the sole entrance to the restroom.

32. The plaintiff observed that the area which contained the urinals and toilets in E-dorm were not equipped with a sink or soap and therefore afforded the inmates and staff using the facilities no opportunity to wash their hands inside of that area after they had urinated and/or defecated.

33. The plaintiff observed that all people who used the urinals and toilets in E-dorm had to touch the swinging doors as they entered the restroom and as they exited the restroom.

34. The plaintiff noted that the other porters in E-dorm did not clean the swinging doors.

35. As a porter, the plaintiff cleaned the swinging doors in E-dorm on his shift.

36. While cleaning the swinging doors in E-dorm, the plaintiff regularly noted the presence of fecal matter on those doors.

37. While cleaning the swinging doors in E-dorm, the plaintiff also noted the presence of other substances such as urine, blood, snot, mucous, purulent matter and other unidentified material on them, albeit with less frequency.

38. The plaintiff and other inmates at Marion are given two (2) bars of "state soap" per week.

39. A bar of state soap measures approximately two inches long by one-and-a-quarter inches wide by one-eighth of an inch thick (2" x 1¼" x ¼"), to wit, it is small.

40. The bar of state soap which the plaintiff receives from the ODRC lasts the plaintiff and other inmates one (1) shower.

41. The plaintiff noted the presence of a liquid soap dispenser mounted to the wall outside of the restroom in E-dorm (in the area containing the sinks).

42. The plaintiff noted that the button that dispenses the soap from the soap dispenser in E-dorm was frequently soiled with the same substances found on the swinging doors.

43. The plaintiff noted that the soap dispenser in E-dorm rarely contained any soap whatsoever.

44. The plaintiff learned from Marion staff that the swinging doors were installed in response to the mandates of the federal Prison Rape Elimination Act (PREA).

45. The plaintiff talked to correctional officers in E-dorm about the lack of liquid soap, but they were unable to assist the plaintiff in having them filled more often.

46. While living in E-dorm, the plaintiff observed that the screens of the newer windows were made from a heavier gauge of wire than the older screens in the windows of the cell blocks.

47. The plaintiff noted that all of the screens in E-dorm were clogged with dirt, dust and debris.

48. The plaintiff noted that the screens in E-dorm allowed insufficient air flow into or out of the dorm.

49. The plaintiff discussed the dirty screens in E-dorm with the correctional officers working in the lock, but they said they were not concerned about the screens being dirty.

50. On June 15, 2019, the plaintiff was moved to 3-dorm.

51. The plaintiff was also classified as a porter in 3-dorm.

52. The plaintiff noted that the same swinging doors had been installed at the sole entrance to the 3-dorm restroom as had been installed in E-dorm.

53. The plaintiff observed that, like E-dorm, the area in 3-dorm which contained the urinals and toilets also was not equipped with a sink or soap and thus afforded the inmates and

staff using the facilities no opportunity to wash their hands inside of that area after they had urinated and/or defecated.

54. The plaintiff observed that all people who used the urinals and toilets in 3-dorm also had to touch the swinging doors as they entered the restroom and again as they exited the restroom.

55. The plaintiff noted that the other porters in 3-dorm, like E-dorm, were not cleaning the swinging doors.

56. The plaintiff cleaned the swinging doors in 3-dorm on his shift.

57. While cleaning the swinging doors, the plaintiff regularly noted the presence of fecal matter on the swinging doors in 3-dorm.

58. While cleaning the swinging doors in 3-dorm, the plaintiff also noted the presence of other substances such as urine, blood, snot, mucous, purulent matter and other unidentified material, albeit with less frequency, on those doors as well.

59. As in E-dorm, the plaintiff and other inmates in 3-dorm are provided with two (2) bars of state soap per week.

60. The plaintiff noted the presence of a liquid soap dispenser mounted to the wall outside of the restroom in 3-dorm as well.

61. The plaintiff noted that the button that dispenses the soap in 3-dorm was also frequently soiled with the same substances found on the swinging doors.

62. As in E-dorm, the plaintiff noted that the soap dispenser in 3-dorm also rarely contained any soap whatsoever.

63. The plaintiff learned from Marion staff that the swinging doors in 3-dorm were also installed in response to the mandates of the federal Prison Rape Elimination Act (PREA).

64. The plaintiff talked to correctional officers in 3-dorm about the lack of liquid soap, but they too were unable to assist the plaintiff in having them filled more often.

65. The plaintiff noted that the screens in 3-dorm were also clogged with dirt, dust and debris.

66. The plaintiff noted that the screens in 3-dorm permitted virtually no air flow into or out of the dorm.

67. The plaintiff discussed the dirty screens with the correctional officers working in 3-dorm, but they stated that there was very little they could do about the screens being dirty.

68. The plaintiff sought out inmates from all of the other dorms at Marion, to wit, dorms 1, 2, 4, 5, 6, 7, 8, A, B, C, D, and F and spoke to them about the filthy swinging doors.

69. The plaintiff learned that every dorm at Marion, with the exception of 7-dorm had the same hazardous swinging door system in place as was in place in E and 3-dorms.

70. The plaintiff sought out inmates from all of the other dorms at Marion, to wit, 1, 2, 4, 5, 6, 7, 8, A, B, C, D, and F dorms and spoke to them concerning whether they had an adequate amount of state soap.

71. The plaintiff sought out inmates from all of the cell blocks at Marion, to wit, G, H, J, K, M, O and R and spoke to them concerning whether they had an adequate amount of state soap.

72. The plaintiff learned that inmates in every dorm and every cell block at Marion received only two (2) bars of state soap per week.

73. The plaintiff asked those same inmates id. supra, if they were able to ask for and receive "extra" state soap upon request.

74. Only a few of the inmates that the plaintiff spoke to stated that they were able to ask for and receive extra state soap upon request.

75. The plaintiff also spoke to inmates in the aforesaid locks (note: locks constitute all cell blocks and dorms) concerning whether they were receiving enough liquid soap (note: cell blocks received no liquid soap whatsoever).

76. Every inmate that the plaintiff spoke to in the aforesaid locks stated that their lock rarely had liquid soap available to wash their hands with.

77. The plaintiff spoke to those same inmates regarding whether the screens in their locks were clogged (please note that G, J and M-block inmates were not questioned because those inmates had the older screens which permitted adequate air flow).

78. Every inmate that the plaintiff spoke to told the plaintiff, frequently after going back to check, that all of their screens were "caked" with dust, dirt and debris.

79. The plaintiff learned that these conditions (filthy swinging doors, the lack of state soap, the virtual complete absence of soap in the liquid soap dispensers, and the clogged screens in the windows) were prevalent in every dorm and cell block (except G, J and M with regard to the liquid soap and clogged screens) at Marion.

80. On many occasions while living in E-dorm and 3-dorm, the plaintiff, after being forced to touch the aforesaid swinging doors to enter and exit the restroom area, went to the sink area and discovered that there was no state soap available to wash his hands with.

81. On many occasions while living in E-dorm and 3-dorm, the plaintiff witnessed other inmates and Marion staff members, who were forced to touch the aforesaid swinging doors to enter and exit the restroom area, go to the sink area and discover that there was no state soap available to wash their hands with.

82. On many occasions while living in E-dorm and 3-dorm, the plaintiff, after being forced to touch the aforesaid swinging doors to enter and exit the restroom area, went to the liquid

soap dispenser mounted on the wall and discovered that there was no liquid soap available to wash his hands with.

83. On many occasions while living in E-dorm and 3-dorm, the plaintiff witnessed other inmates and Marion staff members, who were forced to touch the aforesaid swinging doors to enter and exit the restroom area, go to the liquid soap dispenser mounted on the wall and discover that there was no liquid soap available to wash their hands with.

84. On July 2, 2019, the plaintiff filed "Informal Complaint Resolution" (ICR) MCI0719000028 with defendant Steven Harford and expressed in no uncertain terms that the befouled swinging doors and lack of state soap and liquid soap constituted "appalling living conditions" and requested that something be done about them.

85. On July 2, 2019, defendant Steven Harford responded to ICR MCI0719000028.

86. In defendant Steven Harford's response to ICR MCI0719000028, he stated that:

A. "Due to the 1954 design of the areas, accommodations are limited."

B. "The restroom area that you are discussing must have a door or shielding system that is compliant with policy 79-ISA-01 Prison Rape Elimination."

C. "The door cannot be removed."

D. "There are some options for opening the swinging doors without touching them with your hands."

    (1) "Possibly using a part of your body that is covered with clothing such as your shoulder or back."

    (2) "You may also use a rag or disposable paper to cover you (sic) hands when exiting."

(3)     "Liquid soap is provided, however, you may always purchase bar soap from the Commissary and take it to the restroom with you."

87.   The plaintiff found all of defendant Steven Harford's suggestions to be inadequate, and that his assertion that thousands of inmate's and thousands of staff were always free to purchase soap to protect themselves from the dangerous barrier that the defendants had constructed to be problematic.

88.   After receiving defendant Steven Harford's response to ICR MCI0719000028, the plaintiff advanced MCI0719000028 to the grievance stage.

89.   After filing the grievance in MCI0719000028, the plaintiff spent a great deal of time analyzing the problem of the swinging doors and came up with a safe, viable, simple and cheap alternative to the swinging doors, to wit, the construction of shortened wall.

90.   The plaintiff explained to defendant Kasey Plank in grievance MCI0719000028 that the soap dispensers were empty within twelve (12) hours of being refilled.

91.   The plaintiff explained to defendant Kasey Plank that since there were one-hundred sixty-eight (168) hours in each week, and since each refill was emptied within twelve (12) hours, (thirty-six [36] hours of soap *in toto* per week), inmates in the dorms were going without soap for approximately one-hundred thirty-two (132) hours per week.

92.   The plaintiff explained to defendant Kasey Plank that inmates in the dorms only had soap for about twenty percent (20%) of each week.

93.   Shortly after filing the grievance in MCI0719000028, the plaintiff spotted defendant Steven Harford in the hall and discussed his idea of the shortened wall with him.

94.   After hearing the plaintiff's idea regarding the shortened wall, id supra, Steven Harford stated to the plaintiff that "They are not going to spend more money on that."

95. Defendant Mitzy Clark was employed at Marion and was in charge of allocating soap and chemicals to all of the locks.

96. The plaintiff contacted defendant Mitzy Clark and requested that she refill the soap dispensers more often.

97. Defendant Mitzy Clark stated that she would not refill the soap dispensers more often than she was currently refilling them which was three (3) times per week.

98. After seeking and receiving an extension of time in order to conduct her investigation, on July 30, 2019, defendant Kasey Plank denied grievance MCI0719000028.

99. In defendant Kasey Plank's denial of grievance MCI0719000028, she stated that she had:

A. "Interview[ed] [the] Dorm Officers."

B. "Inspect[ed] [the] 3 Dorm bathroom."

C. "[D]etermined that the swinging door (sic) leading into and out of the restroom, are (sic) cleaned by porters on each shift."

D. "The chemical disincentive (sic) spray are (sic) located in (sic) at the officer's desk for anyone's use if an ID is presented."

E. "Liquid soap dispensers failed (sic) in all lock (sic) 3 times a week."

F. "Sergeant's (sic) pass out bar soap weekly to the population and have extra upon request if needed."

G. "This office finds that you are not forced to touch the swinging doors, and the institution supplies plenty of options for you to avoid germs."

100. Defendant Kasey Plank's assertion that the plaintiff was not forced to touch the swinging doors has no foundation whatsoever in reality and was nothing short of absurd.

101. No one who does not possess telekinesis or teleportation abilities can enter or exit the restrooms described herein without touching those doors unless they crawl under them.

102. The plaintiff was at correctional officer Huff's desk when defendant Kasey Plank came to 3-dorm to "investigate" grievance MCI0719000028.

103. Defendant Kasey Plank never entered the 3-dorm bathroom as she had stated in her response to grievance MCI0719000028.

104. When defendant Kasey Plank left 3-dorm, the plaintiff spoke to correctional officer Huff regarding the reason for defendant Kasey Plank's visit to 3-dorm, id. supra.

105. Correctional officer Huff stated to plaintiff that defendant Kasey Plank had not even spoken to him regarding soap in the restroom.

106. Defendant Kasey Plank never asked correctional officer Huff about soap in any form or fashion while she was investigating MCI0719000028.

107. The plaintiff attempted to speak to defendant Kasey Plank when she was conducting her investigation into MCI0719000028.

108. The plaintiff attempted to show defendant Kasey Plank that during the very time that she was present in 3-dorm to conduct her investigation into MCI0719000028, there was no soap available for inmates to wash their hands.

109. Defendant Kasey Plank told the plaintiff to quit harassing her.

110. After receiving the response from defendant Kasey Plank in MCI0719000028, the plaintiff advanced his complaint to an Appeal to the Chief Inspector.

111. Defendant Kelly Riehle determined in her disposition of MCI0719000028, that since the plaintiff could afford to purchase an ice cream and some tortilla chips, the plaintiff could

be forced to purchase soap to protect himself from the dangerous barrier imposed between the plaintiff and the sole restroom that he was permitted to use.

112. The plaintiff apprised defendants Kasey Plank, Steven Harford, and Kelly Riehle of the hazards of the clogged window screens in MCI07190000120.

113. During the pendency of MCI07190000120, defendant Steven Harford entered 3-dorm and the plaintiff specifically pointed out the filth coating the screens on all of the windows.

114. In response to observing the conditions of the screens, defendant Steven Harford came back to 3-dorm, had all of the beds pulled away from the walls, and had the screens cleaned.

115. The defendants denied the plaintiff's ICR, grievance and Appeal to the Chief Inspector in MCI07190000120.

116. The plaintiff continued to file numerous ICRs, grievances and appeals to the Chief Inspector following their denial of MCI0719000028 (the complaint regarding lack of soap).

117. The plaintiff spoke to many staff members, including, but certainly not limited to: Mitzy Clark, Steven Harford, Kasey Plank, Tara Rees and Lyneal Wainwright, and explained how the lack of an antibacterial soap spilled over into areas where inmates and Marion staff have contracted staph infections, mercer infections, various diseases, illnesses and other communicable diseases.

118. Everyone that the plaintiff spoke to expressed no concern about the lack of antibacterial soap and the occurrence of the various conditions described by the plaintiff, id. supra.

119. In MCI0819000022, the plaintiff complained of the fact that the liquid soap that was provided had absolutely no antibacterial qualities.

120. The defendants denied the plaintiff's ICR, grievance and Appeal to the Chief Inspector in MCI0819000022.

121. Defendant Chris Lambert denied the grievances the plaintiff filed against defendant Kasey Plank on the basis that he had failed to show that defendant Kasey Plank was "personally and knowingly involved in a violation of law, rule or policy," without properly inquiring into the facts of the situation.

122. In these ICRs, grievances and Appeals to the Chief Inspector, the plaintiff succinctly pointed out the dangers of the swinging doors and not providing antibacterial soap, to wit:

   A.  "…that does not change the operative facts which are that we (inmates & staff) are being exposed to potential germs, bacteria, fungus, and diseases by coming into contact with the door system which is in place." (MCI0719000028)

   B.  "I am going to do everything in my power to make certain that I am safe from unsafe, unhealthy living conditions."

   C.  "EVERY SINGLE COMPLAINT THAT I HAVE FILED IS DIRECTED TOWARDS ALLOWING EVERY STAFF MEMBER AND INMATE AT MARION CORRECTIONAL INSTITUTION [TO] AVOID CATCHING SOME DISEASE OR WORSE. I WANT ALL OF US TO BE SAFE. IS IT WRONG TO POINT OUT DANGEROUS CONDITIONS WHEN WE BECOME AWARE OF THEM?" (emphasis in the original).

   D.  "I was thoughtful before I chose unsafe living area before I chose it (sic). The lack of soap promotes an environment that has more bacteria, more viruses, more diseases, and is far more dangerous than it would be if we had soap."

   E.  "This is an important matter that has the potential to harm very many people at this institution. The word, 'outbreak,' is a chilling threat that we are all facing."

F.  "I am filing all of these ICRs on this same topic to establish, with the assistance of MCI staff, that there is a dearth of soap that leaves all of us vulnerable to disease and other bad stuff."

123.  Rebecca Bauer began changing to "Subject" heading of the complaints that the plaintiff was filing regarding the lack of soap, being provided with no antibacterial soap, and the filthy swinging doors, from "Safety/Sanitation" to "Unit 4," thereby disguising the issues that the plaintiff was presenting.

124.  Rebecca Bauer began changing the "Description" of the complaints that the plaintiff was filing regarding the lack of soap, being provided with no antibacterial soap, and the filthy swinging doors from "Safety/Sanitation" to "Other," thereby disguising the issues that the plaintiff was presenting.

125.  After she began receiving the redirected and reclassified complaints from Rebecca Bauer, Teresa Edoja began denying the plaintiff's complaints by echoing the same excuses provided in the previous complaints, i.e., "this has been addressed in a previous complaint."

126.  Since defendant Kasey Plank falsely claimed that there was always soap available in 3-dorm and E-dorm for inmates and staff to wash their hands with after coming into contact with the filthy swinging doors, the plaintiff began enlisting the aid of correctional officers to witness that there was no soap in a barrage of subsequent ICRs, grievances and Appeals to the Chief Inspector's Office.

127.  Eventually defendant Kasey Plank conceded that there was in fact an inadequate amount of soap being provided in response to the multitude of ICRs, grievances and Appeals to the Chief Inspector's Office.

128. Defendant Kasey Plank began responding to the plaintiff's grievances with thinly veiled threats, to wit: "Please be advised that your improper use of the grievance procedure may result in restricted access in accordance with AR 5120-9-31(E)."

129. After conceding that they were providing an inadequate amount of soap, defendants Steven Harford, Kasey Plank and Kelly Riehle maintained that it was the responsibility of the plaintiff and everyone else who was forced to use the restrooms to purchase their own soap to protect themselves from the filthy swinging doors that they had barricaded the restroom with.

130. Eventually, defendants Mitzy Clark, Steven Harford, Kasey Plank and Kelly Riehle conceded they were not providing antibacterial soap but maintained it was the responsibility of the plaintiff and everyone else who was forced to use the restrooms to purchase their own soap to protect themselves from the filthy swinging doors that they had barricaded the restroom with.

131. The plaintiff went on a hunger strike to emphasize the importance of his complaints.

132. Defendants Kasey Plank, Tara Rees, Daniel Straker, Don Melton, Nicolle Wampler, and James Watson, were the "hunger strike committee," and hereinafter are referred to as such.

133. After the plaintiff refused to eat nine (9) meals (3 days) the hunger strike committee was forced by policy to meet with the plaintiff to evaluate the reasons why he was willing to subject himself to torture for an audience.

134. The plaintiff advised the members of the hunger strike committee of the reasons for his hunger strike, to wit:

   A.  Inmates and staff at Marion were not being provided with an adequate amount of soap.

B.     Inmates and staff at Marion were not being provided with any antibacterial soap.

C.     Inmates and staff at Marion were being subjected to unsafe and dangerous living conditions by the presence of the dangerous swinging doors.

D.     Inmates and staff were being subjected inadequate ventilation due to the ill-conceived addition of the newer windows which provided inadequate ventilation.

E.     The defendants were persisting in acting in concert to culture (much "like a Petri dish") a dangerous cocktail of environmental hazards, to wit:

    (1)     severe overcrowding;

    (2)     inadequate ventilation;

    (3)     filthy, dangerous barriers;

    (4)     filthy living conditions, virtually no soap;

    (5)     literally no antibacterial soap.

135.   Plaintiff pointed out that defendant Tara Rees had laminated signs from the Center for Disease Control in Atlanta, Georgia posted all around the medical department and the rest of the institution which stress how important proper hand washing with soap is.

136.   During the aforesaid convention of the hunger strike committee, defendant Tara Rees stated, in response to the issues presented by the plaintiff supra, that she written a paper about the dangers of people "washing their hands too frequently" in defense of not providing an adequate amount of soap and no antibacterial soap.

137.   The hunger strike committee decided that the issues that the plaintiff presented had been previously addressed and had been correctly determined and permitted the plaintiff to continue to starve for his cause.

138. The hunger strike committee forwarded their report of the plaintiff's reasons for going on the hunger strike to defendant Lyneal Wainwright.

139. After receiving the report from the hunger strike committee, defendant Lyneal Wainwright failed to rectify the dangerous conditions at Marion, id. supra, and permitted the plaintiff to continue to starve.

140. Thereafter, the plaintiff continued his hunger strike until he eventually failed.

141. The plaintiff persisted in trying to get the defendants to see the errors of their ways by contacting organizations outside of the prison walls.

142. The plaintiff sent a letter to the Center for Disease Control in Atlanta Georgia asking that they intervene and help the plaintiff force the defendants to correct the dangerous conditions at Marion.

143. The plaintiff sent a letter to the Ohio Department of Health asking that they intervene and help the plaintiff force the defendants to correct the dangerous conditions at Marion.

144. The plaintiff sent a letter to the Marion County Health Department asking that they intervene and help the plaintiff force the defendants to correct the dangerous conditions at Marion.

145. The plaintiff sent a letter to the American Correctional Association asking that they intervene and help the plaintiff force the defendants to correct the dangerous conditions at Marion.

146. The plaintiff sent a letter to the Ohio Justice and Policy Center asking that they intervene and help the plaintiff force the defendants to correct the dangerous conditions at Marion.

147. Generally, the responses from the aforesaid entities indicated that they lacked the authority, but not the desire, to force the defendants correct the dangerous living conditions.

148. In or about January or February 2020, the plaintiff learned of the existence of the "Covid-19."

149. The plaintiff has a history of serious heart disease.

150. In a desperate, last ditch effort to limit the potential harm that Covid-19 could inflict upon the staff and inmate population at Marion, the plaintiff began making suggestions to defendants Steven Harford, Kasey Plank, Tara Rees, Don Melton and Lyneal Wainwright; as well as to non-defendants Michelle Turner and Matt Guiler.

151. The defendants stated to the plaintiff that his suggestions made sense, but did not implement those suggestions, id. supra.

152. Without permission, the plaintiff implemented a few of his suggestions to ameliorate the threat that the corona virus represented to himself and others at Marion, to wit:

A   The plaintiff moved four (4) tables upon which cups, sporks and drinking cambros were placed for the inmates to get their own to a more suitable position which:

    (1)   prevented the inmates from touching the levers that dispense the water, coffee and Kool-Aid for inmates to drink (all inmates were touching them without cleaning in between uses);

    (2)   prevented the inmates from touching the cups other than the one that the inmates chose to drink from (often, inmates will pick up a cup, see that it is not clean, and then mix it back in with the clean cups only to have the next inmate pick up that same cup);

B.   While wearing gloves, the plaintiff filled cups from the cambros for the inmates.

C.   While wearing gloves, the plaintiff passed out those cups to the inmates.

153. On March 27, 2020, defendant Kasey Plank called the correctional officer in the plaintiff's lock and instructed him to send the plaintiff to her office.

154. On March 27, 2020, when the plaintiff was seen by defendant Kasey Plank, she told the plaintiff that she had received some of the plaintiff's documents and an e-mail from defendant Chris Lambert.

155. On March 27, 2020, defendant Kasey Plank stated to the plaintiff that the e-mail she had received from defendant Chris Lambert stated that she was not permitted to give the plaintiff a copy of the e-mail from defendant Chris Lambert.

156. On March 27, 2020, the defendant Kasey Plank read the e-mail from defendant Chris Lambert to the plaintiff.

157. The e-mail that defendant Kasey Plank read to the plaintiff on March 27, 2020, stated that the plaintiff was not permitted to send any correspondence including any grievances that the plaintiff may have to any employee at the ODRC Operations Support Center.

158. On March 31, 2020, the plaintiff sent an e-mail to defendant Lyneal Wainwright regarding prison overcrowding at Marion.

159. On or about March 31, 2020, defendant Lyneal Wainwright spoke to plaintiff and stated that she had no control over prison overcrowding.

160. Defendant Lyneal Wainwright did nothing to rectify the overcrowding issue at Marion.

161. On or about March 31, 2020, the plaintiff sent defendant Lyneal Wainwright an email wherein the plaintiff apprised her of the extremely unsafe and unsanitary practices that were occurring in the chow hall, to wit: everyone touching the levers on the cambros.

162. Defendant Lyneal Wainwright told plaintiff she had read his e-mail about the cambros.

163. Defendant Lyneal Wainwright did nothing to rectify the "extremely unsafe and unsanitary practice" of inmates touching the levers of the cambros.

164. Defendants John Does and Jane Does misappropriated funds under the PREA and thereafter used some of those funds haphazardly to construct dangerous physical structures within the dorms at Marion and other prisons in the State of Ohio.

165. The plaintiff asserts that some of the defendant John Does and defendant Jane Does in ODRC, OSC, and in other Ohio prisons had policies, practices and procedures similar to those at Marion, id infra, and that they did harm and/or cause the deaths of other inmates and staff at those institutions.

166. On April 2, 2020, while living in 7-dorm, amongst the oldest and most vulnerable of the population at Marion, the plaintiff became ill with Covid-19.

167. On April 2, 2020, the plaintiff reported to defendant Theresa Smith that he was ill and that he had Covid-19 and requested to be quarantined.

168. On April 2, 2020, defendant Theresa Smith stated to the plaintiff that she was "sick and tired of hearing people talk about Covid-19," and that she would not quarantine him.

169. On April 3, 2020, the plaintiff again reported to defendant Theresa Smith that he had contracted Covid-19 and that he was even more ill than the day before.

170. On April 3, 2020, defendant Theresa Smith told the plaintiff that Covid-19 was a "hoax," that it was not as serious as the common flu, and that he would not be quarantined.

171. On April 4, 2020, the plaintiff again reported to defendant Theresa Smith that he was ill, getting more ill as the days passed, and again asked to be quarantined.

172. On April 4, 2020, defendant Theresa Smith got mad at the plaintiff and berated him for claiming that he was sick.

173. On April 4, 2020, another nurse was near defendant Theresa Smith when she began getting loud and angry with the plaintiff for stating that he was sick and came over to see why she was so angry.

174. On April 4, 2020, the other nurse, id. above, upon learning that the plaintiff had an elevated temperature above one hundred degrees fahrenheit (100°), informed defendant Theresa Smith that she was required to take the plaintiff to the medical department for a more thorough examination.

175. On April 4, 2020, the plaintiff, after a cursory examination by a different nurse was found to have contracted Covid-19.

176. Defendant Theresa Smith refused for two (2) days to remove the plaintiff from the elderly inmates that lived in 7-dorm despite his pleas for her to do so, making him a plague carrier.

177. Prior to contracting Covid-19, the plaintiff spent an entire month's pay to purchase items that he would require should he contract Covid-19, to wit:

    A.     Tylenol.

    B.     Cough drops.

    C.     Cough syrup.

    D.     Sinus pills.

    E.     Garlic.

    F.     Multivitamin.

    G.     Fish oil.

    H.     Vitamin C.

    I.     Vitamin E.

    J.     Other items.

178. The plaintiff purchased those items in order to bolster his body's immune defense and thus increase his chance of surviving Covid-19.

179. The plaintiff purchased those items to decrease the harmful effects of Covid-19 on his body.

180. The plaintiff purchased those items to alleviate some of the side effects and symptoms of Covid-19 should he contract it.

181. When the plaintiff was placed in quarantine on the afternoon of April 4, 2020, defendant Theresa Smith refused to allow him to grab his "bag of remedies," id. supra, before he was placed in quarantine.

182. From approximately the afternoon of April 4, 2020 through April 6, 2020, the plaintiff engaged every person who passed his quarantine cell, including defendant Tara Rees, and told them that he was extremely sick.

183. From approximately the afternoon of April 4, 2020 through April 6, 2020, the plaintiff engaged staff and medical person who passed his quarantine cell, id. supra, and asked them to get him some medication, like Tylenol, cough syrup, cough drops, sinus pills, et cetera.

184. From approximately the afternoon of April 4, 2020 through April 6, 2020, every single person who passed the plaintiff's quarantine cell, id. supra, told him that they were not there for that purpose.

185. From approximately the afternoon of April 4, 2020 through April 6, 2020, every time a nurse would come to the plaintiff's cell to take his vitals, he asked for medication, like Tylenol, cough syrup, cough drops, sinus pills, et cetera, and they invariably told him that:

    A.    They did not have those items.

    B.    They were not required to dispense those items.

    C.     They were only there to take vitals.

    D.     He should have planned ahead and purchased those items for himself.

186.    From approximately the afternoon of April 4, 2020 through April 6, 2020, the plaintiff engaged every person who passed his quarantine cell, including Betty Spillman and defendant Tara Rees, and asked if they would help him get medications, id. supra.

187.    From approximately the afternoon of April 4, 2020 through April 6, 2020, the plaintiff engaged every person who passed his quarantine cell, id. supra, and asked them if they could help him obtain the medications that he had purchased for himself, id. supra, and they stated that that was not their job.

188.    While the plaintiff was in quarantine, he experienced every possible symptom of Covid-19 that he is aware of, with the exception that he did not notice any rash, to wit:

    A.     Fever for approximately two (2) weeks.

    B.     Loss of taste.

    C.     Loss of smell.

    D.     Loss of appetite.

    E.     Weight loss (15 pounds).

    F.     Diarrhea.

    G.     Sinus drainage.

    H.     Cough.

    I.     Heaviness in chest.

    J.     Difficulty breathing.

    K.     Body aches.

    L.     Joint pain.

M.     Severe headache.

N.     Pain in the eyes.

O.     Cracked lips.

P.     Skin peeling on the feet.

Q.     "Multisystem Inflammatory Disease" (similar to Kawasaki's disease), including:

    (1)     Inflammation of, and damage to, the heart, arteries and blood vessels.

    (2)     Inflammation of, and damage to, the body's organs.

    (3)     Decreased blood flow to the peripheral regions of the body (hands, arms, legs and feet).

    (4)     Lowered blood pressure.

    (5)     Scarring of the lungs.

R.     Vomiting.

189. On April 4, 2020, defendant Lyneal Wainwright gave all inmates in segregation (who were actually there for violating institutional rules) their GTL tablets to contact their families.

190. On April 4, 2020, defendant Lyneal Wainwright gave every inmate on quarantine status, with the sole exception of the plaintiff, their GTL tablets so they could contact family.

191. On April 4, 2020, the plaintiff began requesting, from every Marion defendant staff member that he saw, that he receive his GTL tablet so that he could contact his family and tell them that he was sick.

192. From April 4, 2020 through approximately April 16, 2020, every Marion staff member that the plaintiff spoke to regarding getting his GTL tablet so that he could call his family, including, but not limited to, Betty Spillman and defendants Tara Rees, Lisa Connelly and

Kasey Plank, refused to assist him in obtaining his GTL tablet so that he could call his family.

193. From April 4, 2020 through approximately April 16, 2020, every Marion staff member that the plaintiff spoke to regarding getting his GTL tablet so that he could call his family, including, but not limited to, Betty Spillman and defendants Tara Rees and Kasey Plank, refused to help him make a telephone call using an actual "land line" telephone.

194. From April 4, 2020 through approximately April 16, 2020, every Marion staff member that the plaintiff spoke to regarding getting his GTL tablet so that he could call his family, including, but not limited to, Betty Spillman and defendants Tara Rees, Lisa Connelly and Kasey Plank, refused to help him acquire a pen, pencil, paper or an envelope so that he could write a letter to his family.

195. From approximately April 4, 2020 through April 16, 2020, Betty Spillman and defendants Tara Rees and Kasey Plank, refused to allow the plaintiff to file an ICR, grievance or appeal to the Chief Inspector regarding the way his rights were being violated.

196. On April 5, 2020, Betty Spillman and defendant Tara Rees separately told the plaintiff that he was being moved on April 6, 2020, asked him to be patient, and explained that he would be provided with all of his property when he was moved to the temporary quarantine ward set up in the education department.

197. On April 6, 2020, the plaintiff was moved to the quarantine ward that had been established in the education department.

198. On April 6, 2020, when the plaintiff got to the education department, he observed that the soiled bedding from dozens of beds of the previous Covid-19 patients had been left on the mattresses and were strewn on the floors.

199. On April 6, 2020, despite being extremely weak and terribly ill, the plaintiff, with no help whatsoever, spent more than two (2) hours gathering and removing the soiled bedding from the temporary quarantine ward set up in the education department.

200. On April 6, 2020, despite being extremely weak and terribly ill, the plaintiff, with no help whatsoever, spent several hours spraying disinfectant on the plastic mattress, tables, chairs, microwave, door handles, and other items; and, sweeping and mopping the floors with disinfectant liquid in the temporary quarantine ward set up in the education department.

201. On the morning of April 6, 2020, Marion staff began bringing inmates that they were housing in the temporary quarantine ward set up in the education department all of their personal property.

202. In the evening of April 6, 2020, Marion staff told the plaintiff that since they had not been able to get his property that day, they would bring his property to him the next morning.

203. The plaintiff was the only person in the education quarantine ward that did not receive his property on April 6, 2020.

204. On the morning of April 7, 2020, the plaintiff patiently waited until about 9:00 am before he began asking correctional officer Boyd for his property.

205. On the morning of April 7, 2020, correctional officer Boyd called other staff members to see if they would bring the plaintiff his property.

206. Around noon on the morning of April 7, 2020, defendant Lisa Connelly went to the plaintiff's property; spent more time searching through the plaintiff's property to select a "ditty bag" (a bag which inmates receive when they are placed in segregation for violating institutional rules) than it would have taken to get all of the plaintiff's property, and gave the plaintiff a ditty bag.

207. The ditty bag which the plaintiff received from defendant Lisa Connelly contained only the following items:

   A.     Three (3) t-shirts.

   B.     Three (3) pair of underwear.

   C.     Three (3) pair of socks.

208. The ditty bag that defendant Lisa Connelly gave to the plaintiff on April 7, 2020 did not contain any of his medication, his GTL tablet, his embossed envelopes, writing paper, pens or pencils that the plaintiff required and had been told that he would receive.

209. When the plaintiff asked defendant Lisa Connelly when he would get the remainder of his property, she told the plaintiff he was lucky to get what he got and left.

210. The plaintiff spoke to correctional officer Boyd and asked him to call Betty Spillman and defendant Tara Rees and ask them to help him get his property.

211. On his own initiative, correctional officer Boyd made several calls to other individuals in an attempt to help the plaintiff obtain his property.

212. Correctional officer Boyd called defendant Akil Ragland, explained plaintiff's need for his medications, GTL tablet and stationary and envelopes, and asked Akil Ragland to help the plaintiff get his property.

213. Correctional officer Boyd informed plaintiff that defendant Akil Ragland refused to help plaintiff.

214. None of the individuals that correctional officer Boyd contacted were willing to help the plaintiff, even though they were told what the plaintiff needed.

215. At approximately 1:00 pm on April 7, 2020, after being very sick for five (5) days, the plaintiff stated to correctional officer Boyd that he wanted to go on a suicide watch to try

to force Marion staff to provide him with his medication, GTL tablet, embossed envelopes, writing paper, and pens or pencils.

216. At approximately one o'clock (1:00) pm on April 7, 2020, the plaintiff was taken to the entrance to the segregation block where he was met by defendant Akil Ragland.

217. When the plaintiff was brought before defendant Akil Ragland, the plaintiff attempted to explain to him why he had requested suicide watch.

218. Defendant Akil Ragland immediately and sharply told the plaintiff to "shut up!"

219. The plaintiff shut up as ordered.

220. Defendant Akil Ragland asked the plaintiff if he wanted to go on suicide watch.

221. The plaintiff again began telling defendant Akil Ragland that he was sick and needed his property.

222. Defendant Akil Ragland sharply told the plaintiff to "shut up" again.

223. Defendant Akil Ragland repeated his question regarding whether the plaintiff wanted to be placed on suicide watch.

224. In response to defendant Akil Ragland's question, id. supra, the plaintiff stated, "You told me to shut up."

225. During his interaction with defendant Akil Ragland, the plaintiff, who is an American under the Disabilities Act (ADA), had his Continuous Positive Airway Pressure (CPAP) machine with him.

226. In a fit of anger, defendant Akil Ragland took one (1) of the cords for the CPAP machine from the plaintiff.

227. The plaintiff explained that he required the cord to plug in the CPAP machine.

228. Defendant Akil Ragland stated to the plaintiff, "I don't care."

229. The plaintiff stated to defendant Akil Ragland that he was not authorized to take a medical device from the plaintiff and that only the medical department could do that.

230. Defendant Akil Ragland told the plaintiff, "Watch me."

231. The plaintiff told defendant Akil Ragland that he would not be able to sleep without the cord for his CPAP machine.

232. In response to the plaintiff telling defendant Akil Ragland that he would not be able to sleep without the cord, defendant Akil Ragland smiled at the plaintiff and said, "Good."

233. Defendant Akil Ragland violated federal law and the strictures of the Americans with Disabilities Act (ADA) by taking from the plaintiff one (1) of the cords to his CPAP device.

234. At approximately 1:30pm on April 7, 2020, the staff at Marion placed the plaintiff on suicide watch instead of providing him with medical care, medication, access to a form of communication with his family, or access to the grievance system.

235. Instead of providing the terribly sick plaintiff with medical care, medication, access to a form of communication with his family or the grievance process, the staff at Marion stripped the plaintiff of all clothing and property and placed him in a suicide cell.

236. The cell that the plaintiff was placed in while he was on suicide watch had the following identifiable substances on the toilet, sink, walls, floor and mattress:

    A.    Fecal Matter.

    B.    Blood.

    C.    Urine.

    D.    Toothpaste.

    E.    Food.

    F.    Spittle.

237. Since the plaintiff was naked, it was impossible for the plaintiff to avoid all of the substances smeared all over everything.

238. The plaintiff requested cleaning chemicals to clean the cell with but was told by the correctional officer that he was not permitted to give the plaintiff any chemicals.

239. The plaintiff requested to be moved to a clean cell and the correctional officer told the plaintiff that he could not move the plaintiff.

240. The plaintiff requested that the correctional officer have someone come in and clean the cell but the correctional officer told the plaintiff that no one was permitted to enter the cell with the plaintiff.

241. The plaintiff told the correctional officer that he was extremely tired, wanted to sleep, and required the cord for his CPAP in order to sleep, and requested that he contact defendant Akil Ragland and get the cord from him.

242. The correctional officer watching the plaintiff called someone and thereafter told the plaintiff that defendant Ragland was not going to give the cord back to the plaintiff.

243. After defendant Akil Ragland went home from his shift, eight (8) hours later, the plaintiff was given his CPAP cord.

244. The plaintiff was terribly sick throughout his ordeal with defendant Ragland and had been very sick for nearly a week.

245. The plaintiff was forced to spend many days and nights in the filthy, fecal coated cell while he was terribly sick and on suicide watch.

246. The plaintiff spent most of his time, during the days and nights awake and miserable from April 2, 2020 through April 16, 2020.

247. Around April 8, 2020, the temperature dropped to freezing in Marion, Ohio.

248.  The Marion prison was built around 1950 and has an antiquated heating system which, plaintiff was told, had not yet been turned on.

249.  The "bed" that was in the suicide cell was made of an extremely hard vinyl.

250.  While in the suicide cell, the plaintiff was provided with a "suicide gown."

251.  A suicide gown is an extremely stiff (difficult to bend), sewn and very open garment that prevents the garment's wearer from tying it into knots to choke or hang themselves with.

252.  In addition to the suicide gown, the plaintiff had been provided with a "suicide blanket."

253.  A suicide blanket is also an extremely stiff (difficult to bend), sewn piece of material.

254.  The window of the cell that the plaintiff had been placed in while he was on suicide watch was open.

255.  Due to the post construction addition of metal screens one foot (1') in front of the windows in the segregation lock, the plaintiff was unable to close the window.

256.  The plaintiff requested that the correctional officer watching him remove the lock on the screen and close the window but, even though he tried, the correctional officer was unable to do so.

257.  The plaintiff asked the correctional officer watching him if he could be moved to a different cell where the window was closed and the correctional officer said, "no."

258.  The plaintiff asked the correctional officer watching the plaintiff if he could get more blankets because he was extremely cold, but was denied another blanket.

259.  From the evening of April 8, 2020, and the morning of April 9, 2020, the sick and fevered plaintiff nearly froze to death and spent the evening, night and morning violently shivering.

260.  Since he had been sick and had avoided interacting with the elderly, chronic care inmates in 7-dorm, the plaintiff had not gotten a shower from April 2, 2020 through April 4, 2020.

261.   The plaintiff requested a shower from correctional officers on all shifts on from April 4, 2020 (when he was placed in quarantine) through April 6, 2020, but did not receive a one.

262.   The plaintiff was quarantined in the education department from April 7, 2020 through April 8, 2020, and there were no showers available there.

263.   April 9, 2020, the morning after the extremely sick and fevered plaintiff spent more than twelve (12) hours violently shivering, the plaintiff was permitted to shower on the third shift, at around 11:00pm.

264.   On April 9, 2019, at about 11:10pm, while the plaintiff was taking the shower, and was still suffering the ill effects of Covid-19, he began feeling extremely weak and dizzy.

265.   On April 9, 2019, at about 11:10pm, upon feeling weak and dizzy, the plaintiff began calling for defendant, Martino F. Celli to let him out of the shower immediately because he was having trouble standing.

266.   On April 9, 2019, at about 11:15pm, in response to the plaintiff's explanation to defendant Martino F. Celli that he was weak, dizzy, having trouble standing and needed out of the shower immediately, defendant Martino F. Celli stated to the plaintiff that he would have to wait because an inmate in one of the cells down stairs was acting out.

267.   On April 9, 2019, at about 11:15pm, recognizing that he could not continue to stand and fearing a fall in a shower whose material components constituted steel and concrete exclusively, the plaintiff, naked, was forced to sit down on a short, filthy concrete wall in the shower after repeatedly begging defendant Martino F. Celli to call a nurse.

268.   On April 9, 2019, after waiting approximately five (5) minutes without a nurse being called, the plaintiff, who was continuing to grow weaker and dizzier, was forced to lie down on the filthy prison shower floor to avoid falling at approximately 11:20pm.

269. On April 9, 2019, at about 11:20pm, when the plaintiff laid down on the filthy shower floor, the plaintiff heard defendant Martino F. Celli laugh and tell the plaintiff to "get up."

270. On April 9, 2019, at about 11:30pm, defendant Martino F. Celli contacted the Marion medical department and asked the nurse to come to segregation.

271. On April 9, 2019, at about 11:35pm, defendant Kimberly Baker-McGary, after walking approximately one hundred feet (100'), arrived in the segregation cell block.

272. On April 9, 2019, at about 11:35pm, defendant Kimberly Baker-McGary told defendant Martino F. Celli that she would not enter the shower area or examine the plaintiff because the plaintiff was nude and exposed.

273. On April 9, 2019, from approximately 11:20pm to 11:55pm, despite specific requests for the following, defendant Martino F. Celli permitted the plaintiff to lie on the filthy shower floor without attempting to:

   A.    Turn off the scalding water in the shower.

   B.    Help the plaintiff up off of the filthy shower floor.

   C.    Cover the naked, helpless plaintiff lying on the filthy shower floor.

   D.    Provide any form of aid whatsoever to the plaintiff.

   E.    Call a nurse for a significant amount of time.

274. At approximately 11:45pm, on April 9, 2019, defendant Kimberly Baker-McGary entered the shower area with the plaintiff, after he was covered with a cloth item, and began to examine the plaintiff.

275. At approximately 11:55pm, on April 9, 2019, defendant Kimberly Baker-McGary placed a pulse oximeter (manufacturer ADC) on the plaintiff's right index finger.

276. At approximately 11:55pm, on April 9, 2019, the plaintiff, who was in a position to view the readout on the pulse oximeter, observed that the device registered the plaintiff's heart rate at twenty-four (24) beats per minute.

277. At approximately 11:56pm, on April 9, 2019, after also observing that the plaintiff's heart rate was at twenty-four (24) beats per minute, defendant Kimberly Baker-McGary removed the pulse oximeter from the plaintiff's finger, reset the device, and again placed it on the plaintiff's finger.

278. At approximately 11:56pm, on April 9, 2019, after several seconds, the plaintiff again observed that the pulse oximeter again registered that the plaintiff's heart rate was twenty-four (24) beats per minute

279. At approximately 11:56pm, on April 9, 2019, afraid, the plaintiff asked defendant Kimberly Baker-McGary why his heart rate was twenty-four (24) beats per minute.

280. At approximately 11:57pm, on April 9, 2019, in response to the question posed by the plaintiff, id. supra, defendant Kimberly Baker-McGary:

    A.    First, stated to the plaintiff that the pulse oximeter must be broken.

    B.    Second, removed the pulse oximeter from the plaintiff's finger.

    C.    Third, reset the pulse oximeter again.

    D.    Fourth, again placed the pulse oximeter on the plaintiff's finger for the third time.

    E.    Fifth, turned the plaintiff's hand so that the plaintiff could no longer observe the reading from the pulse oximeter.

281. Defendant Kimberly Baker-McGary never attempted to check the plaintiff's heart rate manually using her fingers and her watch.

282. At approximately 11:58pm, on April 9, 2019, upon hearing and seeing the apparent contradiction between defendant Kimberly Baker-McGary's words and actions, to wit, claiming that the pulse oximeter was broken, and thereafter attempting to utilize it again; combined with defendant Kimberly Baker-McGary's concealing the third pulse oximeter reading from the plaintiff, the plaintiff began pleading for defendant Kimberly Baker-McGary to send him to the hospital.

283. At approximately 11:59pm, on April 9, 2019, the plaintiff stated to defendants Kimberly Baker-McGary and Martino F. Celli that the reading from the pulse oximeter explained why he was weak, dizzy, unable to stand and, why his skin had a bluish hue to it.

284. At approximately 12:05am, on April 10, 2019, defendant Kimberly Baker-McGary stated to defendant Martino F. Celli that she was going to get the electrocardiogram (EKG) from the medical department (located approximately one-hundred feet (100') from segregation).

285. At approximately 12:05am, on April 10, 2019, defendant Kimberly Baker-McGary asked defendants Martino F. Celli and Caleb Steinmetz to carry the plaintiff downstairs so that she could use the examination table in segregation when she got back with the EKG.

286. At approximately 12:06am, on April 10, 2019, defendants Martino F. Celli and Caleb Steinmetz picked the plaintiff up off of the floor and carried him down the stairs to the examination room located in the segregation lock.

287. While defendants Martino F. Celli and Caleb Steinmetz were carrying the plaintiff, they complained to the plaintiff that he was not helping.

288. The plaintiff recalls how emasculating the entire ordeal was, including, but not limited to the fact that, for the first time in his life, he was too weak to walk, and in response to the statement that he was not helping, again told the defendants he needed to go to the hospital.

289. Throughout the ordeal that occurred on April 9, 2019 through April 10, 2019, neither defendants Kimberly Baker-McGary, Martino F. Celli, or Caleb Steinmetz bothered to walk fifty feet (50') to the main hall to get the stretcher outside of the segregation block.

290. At approximately 12:25am on April 10, 2019, defendant Kimberly Baker-McGary returned to the segregation lock with a portable EKG.

291. At approximately 12:35am on April 10, 2019, after obtaining a reading from the EKG, defendant Kimberly Baker-McGary stated that the EKG showed that there was nothing wrong with the plaintiff, and thereafter left the segregation block.

292. From approximately 11:15pm on April 9, 2019 to 12:45am on April 9, 2019, the plaintiff succinctly explained to defendants Martino F. Celli, Kimberly Baker-McGary, Caleb Steinmetz and Richard A. Williams in detail that:

   A.  The plaintiff had an extensive history of heart disease.

   B.  The plaintiff currently had three (3) stints.

   C.  The plaintiff had been diagnosed as having contracted Covid-19.

   D.  The plaintiff had been extremely sick with Covid-19 for an entire week.

   E.  The plaintiff had had a fever for an entire week.

   F.  The plaintiff, while showering that night, had been stricken by the effects of Covid-19 in such a severe way that he was no longer able to stand.

   G.  The plaintiff, while showering that night, had been stricken by the effects of Covid-19 in such a severe way that he was too weak to remain in a sitting position.

   H.  The plaintiff's hands were cold and tingling.

   I.  The plaintiff's arms were cold and tingling.

   J.  The plaintiff's feet were cold and tingling.

K.     The plaintiff's legs were cold and tingling.

L.     The plaintiff's skin had a slightly bluish hue.

M.    The plaintiff was experiencing an incredibly strong buzzing sensation in his brain.

N.    The buzzing sensation in the plaintiff's brain was more intense in the left hemisphere of his brain, than in the right hemisphere.

O.    The plaintiff could feel that something was wrong with his heart.

P.    The plaintiff knew, based upon his knowledge, symptoms and personal medical history that he was experiencing a circulatory issue associated with his heart.

Q.    The plaintiff needed to be transported to Marion General Hospital immediately.

R.    The plaintiff was in an immediate danger of dying.

293.   At some point in time around 12:40am to 12:45am on April 10, 2019, defendant Richard A. Williams told the plaintiff to stand up and return to his cell.

294.   In response to defendant Richard A. Williams command to return to his cell, the plaintiff begged defendant Richard A. Williams to send him to the hospital.

295.   Again, at some point in time around 12:40am to 12:45am on April 10, 2019, defendant Richard A. Williams told the plaintiff a second time to stand up and return to his cell.

296.   In response to defendant Richard A. Williams' second command for the plaintiff stand up and return to his cell, the plaintiff attempted to comply and found that he still too weak to stand and told defendant Richard A. Williams he was too weak to stand.

297.   In response to the plaintiff telling defendant Richard A. Williams that he was still too weak to stand, defendant Richard A. Williams became visibly angry and went into a tirade about:

A.    How he was sick and tired of all "this shit."

B.     How he had worked for very many days straight (maybe twelve [12]) without a day off and how tired he was.

C.     How he had worked extra shifts during all of the days in a row that he had been forced to work.

D.     How he was not going to allow any inmate tell him anything.

298.     The plaintiff, unable to comply with defendant Richard A. Williams direct orders to stand up and walk to his cell, but afraid for his life in the situation, said to defendant Richard A. Williams that the plaintiff was sorry that he was too weak to comply with defendant Richard A. Williams' direct order to stand and walk to his cell.

299.     In response to the plaintiff's explanation of why he was unable to comply with the direct order, defendant Richard A. Williams stated that he "d[id] not want to hear any of that shit," and told the plaintiff a third time to stand up and walk back to his cell.

300.     In response to defendant Richard A. Williams' third direct order to stand up and walk back to his cell, the plaintiff requested that defendant Richard A. Williams:

A.     Permit the plaintiff to wait in the examination room until he had recovered enough of his strength to walk back to his cell.

B.     Have defendants Martino F. Celli and Caleb Steinmetz count the plaintiff in the cell where he was currently lying and later, when able, the plaintiff would walk back to his cell.

C.     Have defendants Martino F. Celli and Caleb Steinmetz help carry the plaintiff back to his cell because he was unable to stand or walk on his own.

301.  In response to the requests made by the plaintiff to defendant Richard A. Williams, he turned to defendants Martino F. Celli and Caleb Steinmetz and said to them, "I am authorizing you two to use direct force to get him back to his cell."

302.  At approximately 12:50am on April 10, 2019, defendant Caleb Steinmetz rolled the plaintiff over on his stomach, lifted the plaintiff's hands behind his back, and secured the plaintiff's hands behind his back with a pair of handcuffs.

303.  At approximately 12:50am on April 10, 2019, defendants Caleb Steinmetz and Martino F. Celli lifted the plaintiff off of the medical examination table in the segregation block utilizing a force technique designed to force compliance from recalcitrant inmates by the application of severe pain.

304.  The force technique applied incorporated the principle of locking the plaintiff's arms into a position commonly referred to as an "arm bar," and using the arm as leverage to apply more force than could ordinarily be achieved without it on the shoulder region of the body.

305.  Thus, utilizing this force technique, the defendants generally have to apply very little pressure to force compliance due to the excruciating nature of this torture practice.

306.  Due to the severe nature of his disability from being stricken by Covid-19, the plaintiff simply was not physically capable of complying with the direct orders given to him by defendant Richard A. Williams.

307.  As a result of the plaintiff's Covid-19 disability, the plaintiff was forced to take the full brunt of the torture for several minutes as defendants Martino F. Celli and Caleb Steinmetz struggled through the narrow (perhaps thirty-six inches [36"]) passages of the segregation block carrying the entire weight of the two hundred pound (200#) plaintiff.

308.  To give some perspective of the "journey" described above, two large men, to wit, defendants Caleb Steinmetz and Martino F. Celli carried another large man, to wit, the plaintiff, through extremely narrow passages designed for only one person.

309.  Instead of taking the plaintiff to his assigned cell via the most direct and shortest route of perhaps fifteen feet (15'), defendants Caleb Steinmetz and Martino F. Celli took a more circuitous route that was more than three times (3x) longer than the direct path, and thus were able to inflict more damage upon the plaintiff for a longer period of time than they could have by taking the shorter route.

310.  While defendants Caleb Steinmetz and Martino F. Celli were carrying the plaintiff using this torture technique, the plaintiff stated to defendants Caleb Steinmetz and Martino F. Celli, "You are hurting me."

311.  In response to the plaintiff's statement that defendants Caleb Steinmetz and Martino F. Celli were hurting him, defendant Caleb Steinmetz, struggling under the weight of the plaintiff said, "I don't give a fuck about you!"

312.  The plaintiff recalls the tops of his feet dragging throughout the torturous path chosen by the defendants Caleb Steinmetz and Martino F. Celli to his cell.

313.  The plaintiff recalls an almost blinding pain from the force technique applied by defendants Caleb Steinmetz and Martino F. Celli.

314.  The plaintiff recalls instances of excruciating pain where defendants Caleb Steinmetz and Martino F. Celli "bounced" the plaintiff in an effort to do more damage to the plaintiff's shoulders.

315.  The plaintiff recalls shedding unbidden tears during the aforesaid torture for the only time in his twenty plus (20+) years of incarceration.

316. When defendants Caleb Steinmetz and Martino F. Celli arrived at the plaintiff's cell, they unceremoniously dumped the plaintiff onto the hard suicide bed, removed the handcuffs from the plaintiff, left the cell, and thereafter locked the cell door.

317. The plaintiff recalls someone laughing about the force that had been used on the plaintiff.

318. The plaintiff recalls how frightening it was to hear his jailers laughing after they had assaulted him and left him for dead.

319. After being deposited onto the hard suicide bed, the plaintiff passed out from the pain.

320. Despite more than an adequate opportunity to walk twenty-five feet (25') to the captain's office to get a video camera as required when a non-emergency planned use of force was to take place, defendants Richard A. Williams, Caleb Steinmetz and Martino F. Celli chose not to record the use of force perpetrated upon the plaintiff.

321. After defendants Caleb Steinmetz and Martino F. Celli were finished using force against the plaintiff, they went to the medical department and they were checked for injuries after having tortured the nearly dead plaintiff.

322. Defendants Caleb Steinmetz and Martino F. Celli reported no injuries from their interaction with the plaintiff during their use of force.

323. Despite the specific mandate of Ohio Administrative Code5120-9-01(C)(5), that all inmates who were subjected to the use of force be examined by the medical department for injuries, the plaintiff was not examined for injuries.

324. After the use of force against the plaintiff, no one came to his cell to see if he was okay.

325. Several hours after defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff awoke from passing out.

326. After defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff experienced extreme and enduring pain in both of his shoulders.

327. After defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff noted that the entire region of both his shoulders, upper arms and portions of his chest and upper back were literally black and blue from extreme bruising.

328. After defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff had a great deal of difficulty using his arms.

329. After defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff had trouble sleeping for nearly a month from the pain that he experienced in the damaged areas of his body.

330. To date, the plaintiff still suffers from the injuries he sustained from being tortured by defendants Caleb Steinmetz, Martino F. Celli and Richard A. Williams.

331. After defendants Caleb Steinmetz and Martino F. Celli used force on the plaintiff, the plaintiff learned the lesson taught by the defendants about filing grievances against Marion staff and thereafter being in a placed in an isolated area out of contact with others.

332. To date, the plaintiff has an extremely healthy fear of being isolated in any remote area of the prison where he will be unable to seek help from someone other than his jailers.

333. After Covid-19 ravaged Marion population, the defendants have begun the remedial action of offering more bars of soap, but still not enough, and far too late.

334. After Covid-19 ravaged Marion population, the defendants have begun the remedial action of offering more liquid soap, but still not enough, and far too late.

335. After Covid-19 ravaged Marion population, the defendants have begun the remedial action of offering antibacterial soap, but far too late.